# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

JOSH LORENZO WILLIAMS and   )
PHILLIP MICHAEL PORTER, JR.,    )
                         )
       Plaintiffs,       )
                         )   No. 2:12-CV-04017-NKL
     v.            )
                         )
SCOTT DECKER, JEFFREY FORCK,    )
MATTHEW STEPHENS, ROSANNA     )
ARENS, and CITY OF COLUMBIA, MO,  )
                         )
       Defendants.     )

## ORDER

Before the Court is Defendants Scott Decker, *et al.*'s motion for summary

judgment on the claims of Plaintiffs Josh Williams and Phillip Porter, Jr. [Doc. # 31].

For the reasons set forth below, Defendants' motion for summary judgment is

GRANTED.

## I.　Uncontroverted Facts

On October 13, 2011, Columbia Police Department Officers Scott Decker, Jeffrey

Forck, and Matthew Stephens were conducting motorcycle training in the City of

Columbia's Cosmo Park. The officers set up orange traffic cones for the training

exercises in the park's parking lot. The officers left the parking lot for approximately

five to ten minutes. When the officers returned, they noticed a vehicle parked in the

northwest corner of the parking lot, in the area where the officers had been conducting their motorcycle training.

As the officers neared the vehicle, they noticed that it was parked at an angle across two adjacent spots, rather than within one of the designated parking spaces. Decker and Forck drove up to the vehicle, both having activated their emergency lighting, and parked facing the driver's side door. Stephens drove up and parked next to Decker and Forck as they were getting off of their motorcycles. As the officers approached the vehicle, they observed two occupants in the front seats of the car. The driver was later identified as Josh Williams and the passenger was later identified as Phillip Porter. The driver's side window of the vehicle was down throughout the encounter with the officers.

Williams and Porter had parked a few minutes earlier and were sitting in the car listening to music. Porter had opened and begun drinking a beer, which was wrapped in a paper bag. Williams had a beer but had not yet opened it when the officers arrived. Both Williams and Porter were over age 21. As the officers approached the vehicle, Williams opened and closed the driver's side door to spit and that is when he first saw the officers.

The officers say that, as they approached the vehicle, they verbally instructed Williams and Porter to show their hands. Williams recalled hearing the officers saying something, but he could not hear them over the radio, which was turned up to about 70% of the volume. According to Williams, as he reached to turn down the radio, he saw the officers draw their firearms. Once the radio was turned down, Williams could hear the

2

officers yelling "Put your hands up," "Don't move," and "It's not worth your life." Williams and Porter raised their hands immediately. Officer Decker pulled Williams from the vehicle by his wrist. Williams told Officer Decker he had an injured wrist. Officer Decker forcefully twisted Williams' wrists behind his back and handcuffed him. He searched Williams. In response to Officer Decker's inquiry as to whether he had any weapons on his person, Williams replied that he had a .40 caliber gun in the car. One of the officers asked Williams if the handcuffs were too tight, to which Williams replied affirmatively, and the officer loosened the handcuffs. After Williams was removed from the car, Park Ranger Rosanna Ahrens arrived at the scene.

Meanwhile, Porter was stepping out of the car when Officer Forck pulled Porter by the wrist from the vehicle. He told Porter to grab his beer and Williams' beer and pour them out. Porter poured out his beer, then opened Williams' beer and poured it out. Officer Forck searched Porter's pockets, then put his arms behind his back and handcuffed him. Porter's name was run through the MULES computer system, which informed the officers that there were no warrants out on him. After being held for approximately 30 minutes, Porter was told he was free to go.

The officers searched the car and found a .40 caliber handgun in the glove box. Officer Forck contacted the dispatch system to run the gun's serial number and check whether Williams had any felony convictions. Officer Forck states that he was told Williams had a felony conviction for a weapons violation while intoxicated. Williams told Officer Forck that he had been arrested for unlawful use of a weapon, but that it had been pled down to a misdemeanor, so he could still possess a handgun. Forck returned to

3

the Columbia Police Department, where a check was run on Williams' criminal history. After Officer Forck determined that Williams had no felony arrests or convictions, Williams' gun was returned to him and he was released.

Plaintiffs assert claims against Defendants Decker, Forck, Matthews, Arens, and the City of Columbia for violations of their Fourth and Fourteenth Amendment rights under the U.S. Constitution (Counts I and II). Plaintiff Williams also asserts claims against Decker, Forck, and Matthews for false arrest and intentional infliction of emotional distress (Counts III and IV, respectively).

## II. Discussion

### A. Summary Judgment Standard

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "A genuine issue of material fact exists if a reasonable jury could return a verdict for the party opposing the motion." *Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 692 (8th Cir. 2009) (quotation omitted). In considering a motion for summary judgment, the Court must evaluate the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir.1991) (citation omitted). At the same time, however, "the nonmoving party may not rest on its pleadings; instead, it must set

4

forth specific facts showing there is a genuine issue of material fact for trial." *Ballard v. Heineman*, 548 F.3d 1132, 1135 (8th Cir. 2008).

### B. Plaintiffs' Constitutional Claims

Defendants argue that summary judgment is appropriate on Counts I and II of Plaintiffs' Complaint, which allege violations of Plaintiffs' constitutional rights, because Defendants are entitled to qualified immunity. The officers and Ranger Arens are entitled to qualified immunity "unless (1) the facts, construed in the light most favorable to [Plaintiffs], establish a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation." *McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011); *see also Chambers v. Pennycook*, 641 F.3d 898, 904 (8th Cir. 2011) ("When a defendant asserts qualified immunity at the summary judgment stage, the plaintiff must produce evidence sufficient to create a genuine issue of fact regarding whether the defendant violated clearly established law."). The two elements of qualified immunity may be addressed in whichever order is best suited to the case at hand. *Rohrbough v. Hall*, 586 F.3d 582, 585 (8th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 235 (2009)).

In this case, the undisputed facts show that the officers and Ranger Arens are entitled to qualified immunity because Plaintiffs have not shown a violation of a clearly established constitutional right. While the precise grounds for Plaintiffs' constitutional claims are not entirely clear, a review of the entire sequence of events shows that the officers and Ranger Arens at no point violated a clearly established constitutional right.

### 1. Search and Seizure

5

Plaintiffs generally allege that Defendants violated their right to be free from unreasonable searches and seizures. The officers in this case initially approached Plaintiffs' vehicle in order to ask them to move it out of the area in which the officers were conducting their motorcycle training. [Docs. ## 32-10 at 1; 32-15 at 1]. At this point, the officers anticipated only a consensual encounter and their decision to approach Plaintiffs' vehicle, regardless of the reason, has no Fourth Amendment implications. *See, e.g.*, *United States v. Campbell*, 843 F.2d 1089, 1092 (8th Cir. 1988) ("It is well-settled that law enforcement officers do not violate the [F]ourth [A]mendment by merely approaching an individual on the street or in another public place by asking him if he is willing to answer some questions [and] by putting questions to him. . . . No objective justification is required for such an encounter because no constitutional interest is implicated." (quotation and citation omitted)). As the officers approached Plaintiffs' vehicle, however, they activated their emergency lights. [Docs. ## 32-3 at 3; 32-4 at 3]. At this time, the officers effectively initiated a traffic stop, which constitutes a seizure under the Fourth Amendment. *See Whren v. United States*, 517 U.S. 806, 809-10 (1996).

Consequently, the question at this point is whether the officers' decision to stop Plaintiffs' vehicle was reasonable under the Fourth Amendment. *See id.* at 810. ("An automobile stop is . . . subject to the constitutional imperative that it not be 'unreasonable' under the circumstances.).

> Because a brief traffic stop is a relatively minor intrusion on the motorist's privacy interests, its Fourth Amendment reasonableness is judged by the standard that applies to investigatory stops—whether the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot. An officer with reasonable suspicion may stop the automobile and

6

may question the driver to determine his identity and to try to obtain
information confirming or dispelling the officer's suspicions.

*Johnson v. Crooks*, 326 F.3d 995, 998 (8th Cir. 2003) (quotations and citation omitted).

"While reasonable suspicion must be more than an inchoate hunch, the Fourth

Amendment only requires that police articulate some minimal, objective justification for

an investigatory stop." *United States v. Farnell*, 701 F.3d 256, 261 (8th Cir. 2012)

(quotation omitted). In determining the reasonableness of a traffic stop, the Court must

consider "the totality of the circumstances—the whole picture." *Id.* at 262 (quotation

omitted).

A review of the totality of the circumstances confronting the officers shows that

the officers had a reasonable suspicion that justified briefly stopping and detaining

Plaintiffs. As the officers approached the vehicle, they noticed that it was parked at an

angle across two parking spaces, instead of between the lines in a single space. [Docs. ##

32-2 at 3; 32-3 at 3; 32-4 at 3]. Officer Decker believed that the vehicle was illegally

parked [Doc. # 32-2 at 3], although Plaintiffs contest this conclusion on the ground that

the City of Columbia's ordinances do not make it an offense to park across the designated

lines in a city park. But Plaintiffs' own submissions show that the City of Columbia has

experienced "problems with . . . illegal parking in Cosmo Park" and that "[p]arking in all

parks is permitted *only in designated parking spaces*." [Doc. # 38-4 at 1-2] (emphasis

added).

Furthermore, where an officer perceives what she reasonably believes to be a traffic violation, she does not violate the Fourth Amendment by stopping the vehicle to investigate, even if she does not ultimately issue a citation.

> For example, an officer who initially stops a car for running a red light may then accept the motorist's explanation that the light was yellow when she entered the intersection and let the driver depart with an oral or written warning. . . . When an officer stops a motorist for a perceived traffic violation, briefly questions the motorist about what occurred, and lets the motorist depart without issuing a citation or expanding the investigation beyond the question of a traffic violation, the officer has not unreasonably intruded upon the privacy and liberty interests protected by the Fourth Amendment.  As the Supreme Court stated in holding police officers not liable under § 1983 for negligently arresting the wrong individual, "[t]he Constitution does not guarantee that only the guilty will be arrested.  If it did, § 1983 would provide a cause of action for every defendant acquitted—indeed, for every suspect released."

*Johnson*, 326 F.3d at 989-99 (quoting *Baker v. McCollan*, 443 U.S. 137, 145 (1979)).

Thus, "[e]ven if the officer was mistaken in concluding that a traffic violation occurred, the stop does not violate the Fourth Amendment if the mistake was an objectively reasonable one."  *Ballard v. Heineman*, 548 F.3d 1132, 1135 (8th Cir. 2008).

In this case, the officers' actions were objectively reasonable even if the way Plaintiffs' vehicle was parked was not actually a citable offense.  Given the City of Columbia's problem with parking at Cosmo Park, it would have been reasonable for the officers to approach Plaintiffs' vehicle in order to see if the driver was aware of how the car was parked and to ask him to correct it.  This is true even if the officers could not have issued a citation for the way Plaintiffs' vehicle was parked—an assumption that is called into question by Plaintiffs' own submissions, *see* [Doc. # 38-4 at 1] ("Parking in all parks is permitted only in designated parking spaces. . . . Our Park Ranger has been

8

ticketing vehicles that are illegally parked.").  Furthermore, Plaintiffs' submissions show that it is an offense to park across the designated lines in some parts of Columbia, MO [Doc. # 38-4 at 4], which suggests that even if Decker was mistaken about Plaintiffs' vehicle being illegally parked, this may have been a reasonable mistake.

More importantly, the manner in which Plaintiffs' vehicle was parked was not the sole reason the officers decided to stop the vehicle.  While "[i]t is well established that a traffic violation—however minor—creates probable cause to stop the driver of a vehicle," *United States v. Barahona,* 990 F.2d 412, 416 (8th Cir.1993), an officer initiating a traffic stop "need not have probable cause," *Farnell*, 701 F.3d at 261.  Even assuming the way the vehicle was parked did not give the officers probable cause to stop the vehicle, it was one of several factors that provided reasonable suspicion to initiate the stop, which was all the Fourth Amendment required in these circumstances.  *See Johnson*, 326 F.3d at 998 ("Because a brief traffic stop is a relatively minor intrusion on the motorist's privacy interests, its Fourth Amendment reasonableness is judged by the standard that applies to investigatory stops—whether the officer's action is supported by reasonable suspicion.).

Officer Forck averred that he was suspicious of the vehicle because:  (1) it was parked irregularly; (2) "it appeared the driver was drinking out of a container with a paper bag wrapped around it and commonly used to conceal alcohol"; and (3) "[t]he individual[s] appeared to be looking around as if they were trying to hide something." [Doc. # 32-3 at 3].  Based on these observations, Officer Forck activated his emergency lights because he "believed the driver was drinking intoxicants while operating a vehicle and both individuals were concealing criminal activity."  [Doc. # 32-3 at 3].  Similarly,

9

Officer Decker averred that his suspicion arose because: (1) he believed the vehicle w as illegally parked; (2) prior to seeing the officers, "there had been no movement in the car", but "[i]mmediately upon seeing [the officers], the driver began moving around quickly in the vehicle"; and (3) he knew that "secluded spots in parks, such as [Cosmo Park], are often used for criminal activity." [Doc. # 32-3 at 3-4].

In addition, both Decker and Forck averred that, as they approached the vehicle, they continued to observe what they considered to be suspicious movements by the vehicle's occupants. [Docs. ## 32-2 at 4; 32-3 at 3]. Due to these movements, the officers repeatedly ordered Plaintiffs to show their hands. According to Forck, he could initially see Williams' hands, but when he told Williams to keep his hands in the air, Williams immediately moved them out of sight. [Doc. # 32-3 at 3]. As a result, Forck believed Williams might be trying to conceal something or obtain a weapon. [Doc. # 32-3 at 3]. Decker likewise wrote that, as they approached the vehicle, Williams' posture went from leaning back in the front seat to leaning forward with his hands concealed from view. [Doc. # 32-2 at 4]. According to both officers, Plaintiffs' repeated failure to respond to their verbal commands caused them to draw their weapons out of concern for their safety. [Docs. ## 32-2 at 4; 32-3 at 3]. Stephens, who was some distance behind Forck and Decker, averred that he could hear Decker repeatedly giving clear directions to Plaintiffs as the officers approached the vehicle. [Doc. # 32-4 at 3-4].

Plaintiffs' deposition testimony, which Plaintiffs rely on to suggest that the officers lacked reasonable suspicion to stop and detain them, at most provides innocent explanations for conduct that reasonably appeared to the officers to be consistent with

10

criminal activity. However, "[t]he behavior on which reasonable suspicion is grounded...
need not establish that the suspect is probably guilty of a crime or eliminate innocent
interpretations of the circumstances." *United States v. Carpenter*, 462 F.3d 981, 986 (8th
Cir. 2006). Rather, "factors that individually may be consistent with innocent behavior,
when taken together, can give rise to reasonable suspicion, even though some persons
exhibiting those factors will be innocent." *United States v. Stewart*, 631 F.3d 453, 457
(8th Cir. 2011). "'This process allows officers to draw on their own experience and
specialized training to make inferences from and deductions about the cumulative
information available to them that might well elude an untrained person.'" *Id.* at 457
(quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Thus, the critical question is
not what Plaintiffs were actually doing inside the vehicle, but how the totality of the
circumstances appeared to the officers, in light of their training and experience.

In this case, the circumstances, as they appeared to the officers, support the finding
that the officers had reasonable suspicion even if Plaintiffs' behavior was also consistent
with lawful conduct. For instance, Plaintiffs argue that Forck's suspicion that the driver
was drinking alcohol while operating a motor vehicle was unfounded because Williams
had not yet opened his beer when the officers arrived. But Porter testified that he had
opened his beer and was drinking from it in the car while it was still wrapped in a brown
paper bag. [Doc. # 32-6 at 2]. Williams testified that his beer was unopened and in the
backseat when the officers approached the vehicle [Doc. # 38-1 at 11], but Porter testified
that, right before he saw the officers, Williams was getting ready to open his beer [Doc. #
32-6 at 5]. According to Porter, at this time Williams' beer was sitting next to Williams

in the crook of the seat, wrapped in a paper bag, and Williams had one hand positioned like he was about to unscrew the cap. [Doc. # 32-6 at 5-6]. In addition, it is undisputed that both beers were recovered from the front passenger area of the car. [Docs. ## 38-2 at 18; 32-3 at 4].

Plaintiffs' testimony suggests that Forck may have been mistaken in his belief that the driver of the vehicle was drinking while operating a motor vehicle, but on first sight and from a distance, it was not unreasonable for Forck to be suspicious about what he observed. *Cf. Ballard*, 548 F.3d at 1135 ("[E]even if the officer was mistaken in concluding that a traffic violation occurred, the stop does not violate the Fourth Amendment if the mistake was an objectively reasonable one."). Forck's experience told him that brown paper bags were commonly used to conceal alcoholic beverages [Doc. # 32-2 at 3], and Forck could not have known whether the two occupants had been sharing the drink inside the bag held by the passenger or whether this was the first drink the occupants had opened or the twelfth. Add to this the suspicious manner in which the vehicle was parked and Decker's knowledge that "secluded spots in parks, such as [Cosmo Park], are often used for criminal activity," [Doc. # 32-2 at 4], and it is clear that the officers had the requisite reasonable suspicion to initiate a stop.

Similarly, Plaintiffs' testimony that they were not moving around suspiciously in the car does not change the fact that the officers reasonably perceived their movements as suspicious. Williams testified that he first noticed the officers when he opened and closed the car door to spit. [Doc. # 32-3 at 3-4]. According to Williams, he then reached forward to turn down the radio because he could not hear what the officers were saying.

12

[Doc. # 32-3 at 5-7].  Porter testified that, around this same time, Williams was preparing to open his beer, which was in the crook of the seat next to him, and that Williams dropped the beer as he reached to turn down the radio.  [Doc. # 32-6 at 5-6].

Considered in isolation, these movements may have appeared innocent.  But at the same time that Williams was reaching for the radio and dropping his beer, the officers were approaching the vehicle and instructing Plaintiffs to show their hands.  Williams testified that, before he turned down the radio, he could hear the officers saying something but he could not understand what they were saying.  [Doc. # 32-5 at 7].  This is consistent with the officers' reports that the vehicle's occupants did not initially comply with their instructions as they approached the vehicle.  Again, that Williams had an innocent explanation for not complying with the orders, namely that the music was too loud, is largely irrelevant because the officers could not have known why the occupants were not complying.  All they knew was that the occupants were not cooperating and this noncompliance contributed to their reasonable suspicion that criminal activity might be occurring and fear for their safety.  *See United States v. Stachowiak*, 521 F.3d 852, 856-57 (8th Cir. 2008) (finding that a suspect's refusal to cooperate with officers contributed to the officers' reasonable suspicion); *United States v. Peoples*, 925 F.2d 1082, 1087 (8th Cir. 1991) (finding that a suspect's refusal to comply with an officer's instructions contributed to a reasonable suspicion that the suspects were engaged in criminal activity and were potentially dangerous).  In addition, the Supreme Court has long recognized that "investigative detentions involving suspects in vehicles are especially fraught with

13

danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047 (1983).  Accordingly, it was not unreasonable for the officers to draw their weapons in these circumstances.

In short, the undisputed facts show that the totality of the circumstances, viewed from the perspective of the officers and in light of their training and experience, justified the brief stop and detention of Plaintiffs.  The officers saw a vehicle parked suspiciously across two spaces in a location known to them to be used for criminal activity and the occupants appeared to be drinking alcoholic beverages.  As the officers approached, the vehicle's occupants began moving around in the car and did not comply with clearly stated instructions.  Although each of these circumstances, in isolation, may have appeared innocent, collectively they provided a sufficient basis for the officers' conduct.

Having established that the stop itself was justified, the additional intrusion caused by the officers' decision to remove Plaintiffs from the vehicle was *de minimis*.  *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977).  In addition, once Williams was removed from the vehicle, he informed Decker that there was a gun in the car.  [Doc. # 38-1 at 18-19].  "[W]here an officer has temporarily removed a suspect from his vehicle, but is not planning to arrest him[,] the officer is permitted to conduct a limited protective search of the vehicle before releasing a suspect to ensure he will not be able to gain immediate control of a weapon."  *Stewart*, 631 F.3d at 459.  Consequently, the officers' subsequent protective search of the vehicle did not violate Plaintiffs' constitutional rights.

Furthermore, Plaintiffs have not provided any evidence or authority that suggests that the length of the detention in this case was unreasonable.  "Whether a particular detention is reasonable in length is a fact-intensive question, and there is no *per se* time

14

limit on all traffic stops." *United States v. Suitt*, 569 F.3d 867, 871 (8th Cir. 2009) (quotation omitted). Accordingly, the reasonableness of the length of a stop "is measured in objective terms by examining the totality of the circumstances." *Id.* (quotation omitted). Generally, an officer "may detain a motorist while the officer completes certain routine tasks related to the traffic violation, such as writing a citation and completing computerized checks of a driver's license, vehicle registration, and criminal history." *United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007).

In this case, the length of Porter's detention, which lasted thirty minutes, was not unreasonable. This was the time necessary for the officers to complete a protective search of the vehicle, check the vehicle's registration, ask Porter a few non-intrusive questions, and run a warrant check for Porter. *See, e.g.*, [Docs. ## 32-2 at 4-5; 32-3 at 4-5]. Williams was detained for approximately one hour due to complications that arose during the routine tasks related to the stop. Specifically, the officers discovered a firearm in the vehicle and a warrant check for Williams revealed that he might have a felony conviction. After calling to verify Williams' criminal history and that it was unlawful for a person with a felony conviction to possess a firearm,[1] Forck told Williams that he was under arrest. [Doc. # 32-3 at 4]. Forck then went to the Columbia Police Department to verify Williams' criminal history, determined that Williams did not actually have a felony conviction, and contacted Decker to tell Decker that Williams could be released.

---

[1] Plaintiffs object to Defendants' reliance on Forck's telephone conversations on the ground that they contain hearsay. But the information Forck received during these phone calls is not being offered to prove the truth of the matter asserted, namely that Williams had a felony conviction, but rather for its effect on the officers' state of mind and resulting decision to further detain Williams while investigating the matter.

15

[Doc. # 32-3 at 5]. "When there are complications in carrying out the . . . purposes of the stop, . . .police may reasonably detain a driver for a longer duration than when a stop is strictly routine." *United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007); *see also Suitt*, 569 F.3d at 871. Thus, the discovery of the firearm and the officers' reasonable belief that Williams was guilty of unlawfully possessing a firearm, though later disproved, provided sufficient grounds to justify the longer detention of Williams.[2]

### 2.    Excessive Force

Plaintiffs claim that the officers used excessive force in violation of the Fourth Amendment.

> The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person. . . . However, not every push or shove violates the Fourth Amendment. . . . Rather, the test is whether the force used to effect a particular seizure is "reasonable." . . . [T]he reasonableness inquiry in an excessive force case is an objective one:  the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

*Guite v. Wright*, 147 F.3d 747, 750 (8th Cir. 1998) (citations and quotations omitted); *see also Chambers*, 641 F.3d at 905-06 ("An officer's use of force violates the Fourth Amendment when it is objectively unreasonable, given the facts and circumstances of the particular case, as judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.") (quotation omitted). Determining whether the

---

[2]  Although Plaintiffs seem to allege in their Complaint that the officers violated their constitutional rights by making Porter pour out the beers, they have not cited any authority in support of this proposition and have not addressed the issue in their response to Defendants' summary judgment motion.  Therefore, the Court will consider this claim abandoned.

use of force was unreasonable "requires a case-specific balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Chambers*, 641 F.3d at 906 (quotation omitted).

In this case, Plaintiffs have failed to submit sufficient evidence from which a jury could conclude that the officers' use of force was unreasonable. Both Plaintiffs seem to allege that the officers used excessive force by pointing their weapons at Plaintiffs. While there is some dispute as to whether the officers had their guns pointed at the ground or directly at Plaintiffs, this is not a material dispute because even assuming the officers pointed their guns at Plaintiffs, this would not amount to excessive force. For the reasons discussed above, it was not unreasonable for the officers to draw their weapons out of concern for their safety, and an officer pointing a weapon at a suspect does not, on its own, constitute excessive force. *See Edwards v. Giles*, 51 F.3d 155, 157 (8th Cir. 1995) ("Woolman's conduct in drawing his gun and pointing it at Edwards, without any indication Woolman intended or attempted to fire the gun, does not rise to the level of a constitutional violation.").

Plaintiffs' deposition testimony also fails to show any indication that the officers used excessive force against them. Porter testified that he was stepping out of the car when he was grabbed by the wrist and pulled to the side. [Doc. # 38-2 at 17]. He stated that his hands were "[s]omewhat, but not really" forcefully placed behind his back and then he was handcuffed. [Doc. # 38-2 at 17]. This "grabbing of the hands" is the entirety of Porter's excessive force claim. [Doc. # 32-6 at 13]. Williams testified that the officers

pulled him from the car and that he couldn't really describe how they pulled him out, but that he thought it was rough. [Doc. # 38-1 at 13]. Once he was out of the car, he was placed on his feet with his hands behind his back. [Doc. # 38-1 at 14-15]. According to Williams, as the officers placed his hands behind his back, they twisted both of his wrists. [Doc. # 38-1 at 15]. Williams was handcuffed and never complained to the officers that the handcuffs were too tight, but at some point an officer asked him if they were too tight. [Doc. # 38-1 at 21]. When Williams responded that they were, the officer loosened the handcuffs. [Doc. # 38-1 at 21]. Williams testified that the handcuffs left marks on his left wrist because of how tight they were. [Doc. # 38-1 at 21]. There is no evidence, however, that Williams suffered a substantial injury to either wrist because of how he was handcuffed.

Plaintiffs' testimony shows that the officers used no more than the amount of force necessary to remove them from the vehicle and handcuff them. As the Eighth Circuit recognized in *Chambers*:

> Handcuffing inevitably involves some use of force, . . . and it almost inevitably will result in some irritation, minor injury, or discomfort where the handcuffs are applied. . . . To prove that the force applied was excessive in that context, therefore, a plaintiff must demonstrate something more.

*Chambers*, 641 F.3d at 907 (quotation and citation omitted); *see also Hanig v. Lee*, 415 F.3d 822, 824 ("For the application of handcuffs to amount to excessive force, there must be something beyond minor injuries."). Consequently, Plaintiffs have not shown that the amount of force the officers used in detaining and handcuffing them was excessive. As such, the officers are entitled to qualified immunity unless a reasonable officer would

have known that it was impermissible to use any force at all in these circumstances. *See Chambers*, 641 F.3d at 904. ("Qualified immunity shields a government official from liability . . . unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable official would have known.").

But the officers' decision to restrain Plaintiffs was not unreasonable. "It is well-established that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 906. As discussed above, when the officers approached Plaintiffs' vehicle, they reasonably suspected that its occupants were engaged in criminal activity. While moving toward the vehicle, the officers observed suspicious movements that caused them to believe Plaintiffs were concealing criminal activity or reaching to obtain a weapon. At this point, the officers began repeatedly instructing Plaintiffs to show their hands. When these instructions went unheeded, the officers' suspicion and fear for their safety peaked. In these circumstances, it was not unreasonable for the officers, upon making contact with Plaintiffs, to remove Plaintiffs from the vehicle and restrain their hands. The officers had a sufficient basis to conduct an investigatory stop and they used no more than the amount of force necessary to effect that stop and ensure their own safety. Because the officers were justified in restraining Plaintiffs and used no more force than necessary to complete that act, they are entitled to summary judgment on Plaintiffs' excessive force claims.

### 3. Equal Protection

Plaintiffs allege that Defendants unlawfully discriminated against them on the basis of race. To succeed on this claim, Plaintiffs must establish that the officers'

19

conduct was motivated by Plaintiffs' race, "which requires proof of both discriminatory effect and discriminatory purpose." *Johnson*, 326 F.3d at 1000. "When the claim is selective enforcement of the traffic laws or a racially-motivated arrest, the plaintiff must normally prove that similarly situated individuals were not stopped or arrested in order to show the requisite discriminatory effect and purpose." *Id.*

On this issue, Plaintiffs have failed to produce sufficient evidence to withstand Defendants' motion for summary judgment. Plaintiffs have not submitted any evidence showing that similarly situated, non-African American individuals were not stopped or arrested. In addition, Plaintiffs' testimony shows that the officers at no time during this incident made any racially-motivated statements or comments. [Docs. ## 32-5 at 13; 32-6 at 11]. Rather, Plaintiffs' equal protection claim rests entirely on the fact that they were of a different race than the officers and a report by the Missouri Attorney General on racial profiling, which allegedly shows a racial disparity in enforcement activity by the Columbia Police Department.

But the mere fact that Plaintiffs were of a different race than the officers is not sufficient to establish a case of discrimination. *See Johnson*, 326 F.3d at 1000 ("'We do not think . . . that the combination of an arbitrary stop . . . with a difference in race between the person stopped and the officer establishes a prima facie case of racial discrimination.' " (quoting *Ford v. Wilson*, 90 F.3d 245, 248-49 (7th Cir. 1996)). Regarding the Missouri Attorney General's report, the Eighth Circuit considered a similar report in *Ballard v. Heineman*, 548 F.3d 1132 (8th Cir. 2008). In affirming summary judgment in favor of the defendant police officer, the *Ballard* court found that, "although

20

the . . . report contains statistical data related to racial profiling generally . . . , it does not contain specific facts showing that [the officer] stopped this vehicle for racially-motivated reasons . . . ." *Ballard*, 548 F.3d at 1136. Accordingly, this report, without more, failed to raise "a genuine issue of material fact as to the constitutionality of the traffic stop or subsequent search and seizure." *Id.* at 1135. Similarly, Plaintiffs in this case have not submitted any evidence that the officers' interaction with them was racially-motivated. Consequently, Plaintiffs' reference to the Missouri Attorney General's report, which contains only statistical data related to racial profiling in general, is not, without more, sufficient to withstand Defendants' motion for summary judgment.

### 4. Conspiracy

Plaintiffs generally allege that the individual defendants in this case conspired to violate their rights. To succeed on such a claim, "the plaintiff must show: that the defendant conspired with others to deprive him or her of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff." *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). In addition, the plaintiff is "required to prove a deprivation of a constitutional right or privilege." *Id.*

For the reasons discussed above, Plaintiffs have not shown a deprivation of a constitutional right. In addition, Plaintiffs have not submitted any evidence that might permit the inference that Defendants reached an understanding to violate their rights, which is an essential element of Plaintiffs' conspiracy claim. *See Nelson v. City of McGehee*, 876 F.2d 56, 59 (8th Cir. 1989) ("To create a genuine issue of conspiracy,

21

Nelson had to point to at least some facts which would suggest that appellees "reached an understanding" to violate [his] rights."). Consequently, Defendants are entitled to summary judgment on Plaintiffs' conspiracy claim. *See id.* ("[W]hile it is true that appellees have the burden of showing that there is no genuine issue of material fact, this in no way relieved Nelson of his own burden of producing, in response to appellees' motion for summary judgment, evidence that would support a jury verdict. Nelson cannot and will not be allowed to discharge his burden by not offering any significant probative evidence tending to support his conclusory allegations of a conspiracy.").

### 5. The City of Columbia

Plaintiffs name the City of Columbia in their counts alleging constitutional violations, apparently on the basis that the City of Columbia instituted policies, practices, or customs that caused Plaintiffs' rights to be violated. However, "in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim." *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir. 2007). Because Plaintiffs have not established that any of the individual defendants are liable for a constitutional violation, as discussed above, the City of Columbia is entitled to summary judgment on these claims.

### C. Plaintiff's State Law Claims

### 1. False Arrest

Defendants argue that Williams' Missouri law claim for false arrest against Officers Decker, Forck, and Matthews is barred by the doctrine of official immunity. This doctrine "protects public employees from liability for alleged acts of negligence

committed during the course of their official duties for the performance of discretionary acts." *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. 2008) (en banc). Accordingly, "[p]olice officers are not liable for negligent acts that are related to discretionary functions." *Blue v. Harrah's N. Kan. City, LLC*, 170 S.W.3d 466, 479 (Mo. Ct. App. 2005). "Deciding whether or not to arrest someone is a matter of discretion— the officer must decide what course should be pursued based on the circumstances at hand." *Id.* Consequently, the officers are entitled to official immunity on Williams' claim unless they acted in bad faith or with malice. *See id.*

But Williams has not presented any evidence that the officers acted in bad faith or with malice. It is undisputed that a firearm was found in the car and that an initial criminal history check for Williams indicated that he had a felony conviction. It is also undisputed that it is a crime under Missouri law for a person who has a felony conviction to knowingly possess a firearm. Mo. Rev. Stat. § 571.070. The officers thus had a good faith belief that Williams was guilty of this offense and Williams has not submitted any evidence that might support a contrary conclusion. In fact, it is undisputed that Forck traveled to the Columbia Police Department to make sure that Williams had the requisite conviction and, upon learning that Williams did not have a felony conviction, immediately informed Decker that Williams should be released. [Doc. # 32-3 at 5]. As these facts show no indication of bad faith or malice, the officers are entitled to official immunity and summary judgment is appropriate on this claim.

### 2.    Intentional Infliction of Emotional Distress

The only remaining claim is Williams' Missouri law claim for intentional infliction of emotional distress. To succeed on this claim, Williams must show "extreme and outrageous conduct by a defendant." *Gibson v. Brewer*, 952 S.W.2d 239, 249 (Mo. 1997) (en banc). "The conduct must have been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* In addition, Williams must show that the conduct was "intended *only* to cause extreme emotional distress to the victim." *Id.* (emphasis added).

Williams' claim for intentional infliction of emotional distress is based on the officers' display of their firearms. As discussed previously, however, the officers in this case drew their firearms out of concern for their safety when Plaintiffs failed to comply with their instructions. This fear was reasonable, as the officers suspected that Plaintiffs were engaged in criminal activity and it is well-established that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." *Long*, 463 U.S. at 1047. Considering the circumstances, nothing in Williams' account of the officers' actions describes conduct that could be considered as going beyond all possible bounds of decency. Furthermore, there is no evidence that disputes the officers' stated reasons for drawing their firearms and restraining Williams. In light of the uncontroverted explanation offered by the officers, the evidence does not permit a finding that the officers' sole intention in this encounter was to cause Williams extreme emotional distress. Thus, Williams has failed to submit evidence on an essential element

of this claim, *see Gibson*, 952 S.W.2d at 249, and the officers are entitled to summary

judgment.

**IV.     Conclusion**

     For the reasons set forth above, Defendants Scott Decker, *et al.*'s motion for

summary judgment [Doc. # 31] is GRANTED.




                         s/ Nanette K. Laughrey
                         NANETTE K. LAUGHREY
                         United States District Judge

Dated:  March 29, 2013
Jefferson City, Missouri